**SHELL CHEMICAL CO., etc., et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**Nos. 86–4161, 87–4451.**

United States Court of Appeals, Fifth Circuit.

Aug. 19, 1987.

---

Baker & Botts, Larry B. Feldcamp, Houston, Tex., Covington & Burling, Robert M. Sussman, Sandra P. Montrose, Washington, D.C., David D. Sigman, Exxon Chemical Americas, Kathleen Gillmore, Chemical & Environmental Legal Dept., Shell Oil Co., Houston, Tex., for petitioners.

Mark N. Duvall, New Fairfield, Conn., for Union Carbide Corp.

Lee M. Thomas, E.P.A., Andrew G. Gordon, Beth S. Ginsberg, Attys., U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C. for respondent.

Jacqueline M. Warren, Nat. Resources Defense Council, David A. Hansell, New York City, Robert M. Sussman, Sandra P. Montrose, David F. Zoll, Chemical Mfg., Assoc., Washington, D.C., David D. Sigman, Exxon Chemical Am., Kathleen C. Gillmore, Shell Oil Co., Houston, Tex., Mark N. Duvall, Union Carbide Corp., Danbury, Conn., for intervenor—Nat. Resources Defense Council.

Martha A. Beauchamp, Washington, D.C., for intervenor, American Petroleum Institute.

Before RUBIN, GARZA and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The petitioners in this case seek review of a final rule promulgated by the Environmental Protection Agency ("EPA"). Because potentially important information bearing on the factual basis for the rule has come to light after the rule's promulgation, because in this close case that information may be determinative, and because the parties themselves seem to acknowledge the potential importance of this information, we remand this case to the EPA to reconsider its rule in the light of this new information.

I

The petitioners, Shell Chemical Co., Exxon Chemical Americas, Eastman Kodak Co., and Union Carbide Corporation, manufacture a substance known as mesityl oxide ("MO") which is used as a chemical intermediate in the manufacture of an industrial solvent known as methyl isobutyl ketone ("MIBK").[1]

The Environmental Protection Agency ("EPA"), pursuant to its rulemaking authority under the Toxic Substances Control Act ("TSCA"), has promulgated a final rule requiring that manufacturers and processors of MO must test the substance for its harmful effects on human health. The petitioners seek review of this rule and argue that it should be set aside on grounds that it is not supported by substantial evidence.

In June 1979, the Interagency Testing Committee ("ITC") recommended that MO be tested for various health hazards. The EPA issued a proposed test rule for MO in

---

1. In the past, MO has been used as a solvent in a variety of contexts. MO has also been used in the formulation of pesticides.

the July 5, 1983, issue of the Federal Register. Following notice and comment proceedings, during which the EPA received numerous criticisms of the proposed rule from members and representatives of affected industries, the EPA promulgated its final order on July 6, 1986. The order required manufacturers and processors of MO to test it for potential human health effects (specifically for chronic, genetic or cancerous effects). The EPA estimated that the testing costs for the final rule would range from $1,872,800 to $2,824,000. Four manufacturers of MO now seek review of the EPA's rule.

## II

Under section 4(a)(1) of the TSCA, the EPA must require testing of a chemical substance to develop health or environmental data if the Agency finds that:

(A)(i) the manufacture, distribution in commerce, processing, use or disposal of' a chemical substance or mixture or that any combination of such activities, may present an unreasonable risk or injury to health or the environment,

(ii) there are insufficient data and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data; or

(B)(i) a chemical substance or mixture is or will be produced in substantial quantities, and (I) it enters or may reasonably be anticipated to enter the environment in substantial quantities or (II) there is or may be significant or substantial human exposure to such substance or mixture,

(ii) there is insufficient data, and experience upon which the affects [sic] of the manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the envi-

ronment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data;

Codified as 15 U.S.C. § 2603(a).

The EPA concluded, pursuant to section 4(a)(1)(A), the manufacture, processing and distribution in commerce of MO "may present an unreasonable risk" to human health due to potential chronic, mutagenic (genetic) and oncogenic (cancerous) effects.

The provisions of the TSCA providing for judicial review provide that an EPA rule promulgated pursuant to the Act must be sustained if it is supported by substantial evidence. 15 U.S.C. § 2618(a)(1)(B). It should be noted that the substantial evidence test is less deferential than the "arbitrary and capricious" standard used in reviewing many agency actions.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

The parties dispute the degree of risk that must be supported by substantial evidence. Resolution of this dispute will require a careful inquiry into the interplay between the statutory language of risk and the substantial evidence test in the context of this case. A delicate line-drawing problem is thus presented. Obviously, the agency need not conclusively find that MO presents an unreasonable health risk, since, in that case, there would be no need for further testing, and the substance could then be directly regulated. On the other hand, the statutory language contemplates some sort of finding of risk, otherwise *all* substances covered by the Act would be subject to testing. It goes without saying that the specific facts are of crucial importance in this case.

In its rulemaking record, the EPA notes that MO's use has declined in recent years, presently confined largely to its role as an intermediate in the manufacture of MIBK. This use presents only limited exposure to humans because only a few hundred work-

ers are involved, and production takes place in an enclosed, controlled environment where potential exposure to MO is very limited. At oral argument, however, the EPA maintained that post-promulgation developments showed that the use of MO was increasing and that such increased use was not confined to the manufacture of MIBK. In their post-argument submissions, however, the petitioners strongly contest the EPA's statements about these later developments, arguing that since the EPA's promulgation of its testing rule, the use of MO has declined significantly to the point where only about 100 workers are involved in MO operations at the facilities that manufacture and use the substance.

The post-promulgation developments concerning both the amount of MO used and the way in which the substance is and will be utilized are clearly relevant in assessing how much exposure to MO there is and will be to humans. As such, these developments are highly pertinent to determining whether there is substantial evidence to show that MO may present an "unreasonable risk"; the pertinence is all the more accentuated because we view this case as a close one. We believe it advisable, therefore, to remand this case for the EPA to make supplemental findings in the administrative record concerning the changes in MO use that have occurred since the testing rule was promulgated and, if determinable, that will occur in the foreseeable future. The EPA should then reconsider its testing rule in the light of those findings.

We are, of course, aware that in every administrative review case, there are subsequent developments that may bear on the validity of an agency rule, but in this close case we believe that the need for updated factfinding warrants a remand for a more sure-footed appellate decision.

### III

For the reasons discussed earlier, this case is remanded to the EPA for further proceedings in accordance with this opinion. Pending those proceedings, implementation of the EPA's MO testing rule is stayed.

REMANDED.