**CHEMICAL MANUFACTURERS ASSOCIATION, et al., Petitioners,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 86–1718.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1988.

Decided Oct. 21, 1988.

Robert M. Sussman, with whom William K. Rawson, David F. Zoll, Washington, D.C., and Mark N. Duvall were on the brief, for petitioners. Gabrielle H. Williamson, Washington, D.C., entered an appearance for petitioners.

Ashley Doherty, Atty., U.S. Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., Beth Ginsberg, Atty., U.S. Dept. of Justice, and Andrew G. Gordon, Atty., U.S. E.P.A., were on the brief, for respondent. Michael W. Steinberg, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before WALD, Chief Judge, and STARR and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioners, Chemical Manufacturers Association and four companies that manufacture chemicals [1] (collectively, "CMA"), seek to set aside a rule promulgated by the Environmental Protection Agency ("EPA" or "the Agency").[2] This Final Test Rule was promulgated under section 4 of the Toxic Substances Control Act ("TSCA" or "the Act"), 15 U.S.C. §§ 2601–2629. The Final Test Rule required toxicological testing to determine the health effects of the chemical 2–ethylhexanoic acid ("EHA"), and it continues to impose on exporters of EHA a duty to file certain notices with EPA.

We uphold EPA's interpretation of TSCA as empowering the Agency to issue a test rule on health grounds where it finds a more-than-theoretical basis for suspecting that the chemical substance in question presents an "unreasonable risk of injury to health." This, in turn, requires the Agency to find a more-than-theoretical basis for concluding that the substance is sufficiently toxic, and human exposure to it is sufficient in amount, to generate an "unreasonable risk of injury to health." We hold, further, that EPA can establish the existence and amount of human exposure on the basis of inferences drawn from the circumstances under which the substance is manufactured and used. EPA must rebut industry-supplied evidence attacking those inferences only if the industry evidence succeeds in rendering the probability of exposure in the amount found by EPA no more than theoretical or speculative. The probability of infrequent or even one-time exposure to individuals can warrant a test rule, so long as there is a more-than-theoretical basis for determining that exposure in such doses presents an "unreasonable risk of injury to health." Finally, we hold that the Agency correctly applied these standards in this case and that its findings are supported by substantial evidence. Consequently, we affirm the Final Test Rule.

## I. BACKGROUND

### A. Statutory Structure

TSCA provides for a two-tier system for evaluating and regulating chemical substances to protect against unreasonable risks to human health and to the environment. Section 6 of the Act permits EPA to regulate a substance that the Agency has found "presents or will present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a). Section 4 of the Act empowers EPA to require testing of a suspect substance in order to obtain the toxicological data necessary to make a decision whether or not to regulate the substance under section 6. The Act provides, not surprisingly, that the level of certainty of risk warranting a section 4 test rule is lower than that warranting a section 6 regulatory rule. EPA is empowered to require testing where it finds that the manufacture, distribution, processing, use or

---

1. The company petitioners are Hoechst–Celanese Corporation, Eastman Kodak Company, Filo Chemical Inc. and Union Carbide Corporation.

2. 2–Ethylhexanoic Acid Final Test Rule, 51 Fed. Reg. 40,318 (1986) (codified in part at 40 C.F.R. § 799.1650 (1987)) (the "Final Test Rule").

disposal of a particular chemical substance "may present an unreasonable risk of injury to human health or the environment." *Id.* § 2603(a)(1)(A)(i). The Agency's interpretation of this statutory standard for testing is the central issue in this case.

One of the chief policies underlying the Act is that—

adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment and that the development of such data should be the responsibility of those who manufacture and those who process such chemical substances and mixtures.

*Id.* § 2601(b)(1). The statute establishes an Interagency Testing Committee, comprised of scientists from various federal agencies, to recommend that EPA give certain chemicals "priority consideration" for testing. *Id.* § 2603(e). Under section 4, the Agency "shall by rule require that testing [of a particular chemical] be conducted" if three factors are present: (i) activities involving the chemical "may present an unreasonable risk of injury to health or the environment"; (ii) "insufficient data and experience" exist upon which to determine the effects of the chemical on health or environment; and (iii) testing is necessary to develop such data. *Id.* § 2603(a)(1)(A). The companies that manufacture and process the substance are to conduct the tests and submit the data to the Agency. *Id.* § 2603(b)(3)(B). Costs of testing are to be shared among the companies, either by agreement or by EPA order in the absence of agreement. *Id.* § 2603(c)(3)(A).

A test rule promulgated under section 4 is subject to judicial review in a court of appeals, pursuant to section 19(a) of TSCA, 15 U.S.C. § 2618(a). A test rule may be set aside if it is not "supported by substantial evidence in the rulemaking record ... taken as a whole." *Id.* § 2618(c)(1)(B)(i).

### B. *Facts and Prior Proceedings*

EHA is a colorless liquid with a mild odor. It is used exclusively as a chemical intermediate or reactant in the production of metal soaps, peroxy esters and other products used in industrial settings. EHA itself is totally consumed during the manufacture of these products; as a result, no products offered for sale to industry or to consumers contain EHA. *See* Final Test Rule, 51 Fed.Reg. at 40,319.

The Interagency Testing Committee first designated EHA for priority consideration for health effects tests on May 29, 1984. Fourteenth Report of the Interagency Testing Committee to the Administrator, 49 Fed.Reg. 22,389, 22,391 (1984). The Committee based its recommendation in part on the structural similarity of EHA to chemicals known to cause cancer in test animals and on its finding that insufficient information existed concerning the chronic health effects of EHA. *Id.* at 22,399–400. Subsequently, EPA held two public meetings on EHA. Supplemental Joint Appendix ("S.J. A.") 499–504, 505–15. During these meetings, in which persons representing the petitioners made appearances, EPA sought information on a variety of issues relating to EHA uses, production and human exposure. S.J.A. 502–04, 508–11, 513–14.

EPA issued a proposed test rule on May 17, 1985. 2–Ethylhexanoic Acid Proposed Test Rule, 50 Fed.Reg. 20,678 (1985) (the "Proposed Test Rule"). The rule proposed a series of tests to ascertain the health risks of EHA, and it set out proposed standards for the conduct of those tests. *Id.* at 20,682–83. EPA based the Proposed Test Rule on a finding that EHA "may present an unreasonable risk" of subchronic toxicity (harm to bodily organs from repeated exposure over a limited period of time), oncogenicity (tumor formation) and developmental toxicity (harm to the fetus). *Id.* at 20,682. As to subchronic toxicity, EPA cited studies suggesting that both EHA and chemicals structurally similar to it cause harm to the livers of test animals. *Id.* As to oncogenicity, EPA cited studies suggesting that chemicals structurally analogous to EHA cause cancer in laboratory animals. *Id.* at 20,681–82. As to developmental toxicity, EPA cited studies indicating that both EHA and its chemical analogues have produced fetal malformations in test animals. *Id.* at 20,682.

The Proposed Test Rule also addressed the question of whether humans are exposed to EHA, a question of critical importance to this case. The Agency acknowledged that, since no finished products contain EHA, consumer exposure is not a concern. It likewise discounted the dangers of worker exposure to EHA vapors. *Id.* at 20,681. The Agency based its Proposed Test Rule solely on the potential danger that EHA will come in contact with the skin of workers. As evidence of potential dermal exposure, the Agency noted that approximately 400 workers are engaged in the manufacture, transfer, storage and processing of 20 to 25 million pounds of EHA per year. *Id.* at 20,679, 20,682. Further, rebutting claims by industry representatives that gloves are routinely worn during these activities, EPA noted that worker hygiene procedures "can vary widely throughout the industry," that workers are not required by existing federal regulations to wear gloves, and that the industry had not monitored work sites for worker exposure to EHA. *Id.* at 20,680–81.

A public comment period commenced with the publication of the Proposed Test Rule and ended on July 16, 1985. EPA held a public meeting on October 8, 1985, to discuss issues related to the Proposed Test Rule. J.A. 69–71. Industry representatives submitted extensive comments on July 15, 1985, and January 17, 1986. J.A. 96–97, 161–63. Before publication of the Final Test Rule, EPA received notice of a new study purporting to present further evidence of the potential developmental toxicity of EHA. Final Test Rule, 51 Fed. Reg. at 40,319–21.

CMA criticized the toxicology studies cited by EPA and sought to show that the use of gloves by employees of companies working with EHA prevented human exposure to the chemical, thus rendering any test rule invalid. Before publication of the final rule, CMA retained an independent consultant to conduct a survey of glove use by the employees of companies working with EHA. J.A. 32–47 (the "Glove Use Survey"). The results of the survey were submitted to EPA. CMA also submitted the results of an Eastman Kodak Co. study of the permeability of nitrile and neoprene gloves. J.A. 68 (the "Glove Permeability Study").

EPA published the Final Test Rule for EHA on November 6, 1986. The rule required a 90–day subchronic toxicity test, a developmental toxicity test, and a pharmacokinetics test. Final Test Rule, 51 Fed. Reg. at 40,318. In the preamble to the Final Test Rule, EPA asserted its finding of potential exposure to EHA. The Agency rebutted industry claims of non-exposure by criticizing the methodology of the Glove Use Survey and the Glove Permeability Study. *Id.* at 40,320.[3] The Final Test Rule also addressed the industry critique of the prior toxicology studies on EHA. Acknowledging some weaknesses in the studies, EPA nonetheless asserted that they "add to the weight of evidence" supporting findings of potential toxicity and thus helped to justify further testing. *Id.* at 40,321.

The pharmacokinetics study required by the rule entailed the oral and dermal administration of EHA to experimental animals, at low and high doses. *Id.* at 40,327–28. The subchronic toxicity study involved administering EHA to animals in graduated daily doses over a period of 90 days. *Id.* at 40,323, 40,328–30. The developmental toxicity tests entailed administering EHA orally in various doses during the pregnancy of experimental animals. *Id.* at 40,323, 40,330. All studies were to be conducted in accordance with EPA standards. Results were to be submitted by certain deadlines, the last of which was 18 months after the effective date of the Final Test Rule; hence, the last deadline was June 20, 1988.[4] *Id.* at 40,330.

---

**3.** EPA also found that, "although current exposure may appear to be low, future exposure from the same or different uses may change." *Id.* at 40,322.

**4.** Later, at the request of CMA, the Agency extended the deadline for subchronic toxicity testing from March 20 to June 20, 1988. 2–Ethylhexanoic Acid Technical Modification, 52 Fed. Reg. 24,157, 24,158 (1987).

The petitioners filed this petition for review on December 23, 1986, moving at the same time for a stay pending review. This court denied the stay motion on January 20, 1987.

The last of the required test data were submitted to EPA on June 20, 1988. EPA moved this court on June 9, 1988, for leave to file a motion to dismiss the case as moot. By order on June 30, 1988, the court denied the motion and directed that the parties address the mootness issue before this panel.

## II. MOOTNESS

■ EPA argues that this petition for review is moot because all of the test results have been submitted. CMA does not seek damages or reimbursement for having conducted the tests. Thus, the Agency argues, there are no residual effects of the testing requirement to keep the controversy alive. We nonetheless hold the case to be justiciable, because the rule continues to impose concrete obligations on companies handling EHA.

The doctrine of mootness is one aspect of the requirement that federal courts decide only actual "cases" or "controversies." U.S. Const. art. III, § 2. In order for a case not to be moot, a party must show a direct injury that gives it a continuing " 'personal stake' " in the outcome of the litigation. *Sample v. Johnson*, 771 F.2d 1335, 1339 (9th Cir.1985) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). In this sense, the mootness inquiry is similar to the inquiry of whether a party has constitutional standing. *Sample*, 771 F.2d at 1339; 13A C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3533.1 at 219 (1984) (assimilating mootness principles with standing principles) [hereinafter "Wright & Miller"]. Federal courts are constitutionally forbidden to render advisory opinions or "to decide questions that cannot affect the rights of litigants in the case before them." *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 90–91 (D.C.Cir.1986) (quoting

*North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)).

On the other hand, a claim for prospective relief remains justiciable so long as the conduct complained of has "continuing, present adverse effects." *See O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). The fact that the principal form of relief that a party seeks is no longer available does not in itself render the case nonjusticiable. *See Better Gov't Ass'n*, 780 F.2d at 91–92; *Maine Central R. Co. v. Brotherhood of Railway Maintenance Employees*, 813 F.2d 484, 487 (1st Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 91, 98 L.Ed.2d 52 (1987). "Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack*, 395 U.S. 486, 497, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). This is so even where the mooted claim is much greater in magnitude than the remaining ones. *Id.* In light of the similarity between mootness and standing, it should be noted that the "distinct and palpable injury" a party must suffer in order to be deemed to have constitutional standing, *Warth v. Seldin*, 442 U.S. at 501, 95 S.Ct. at 2206, "need not be tangible or great: an 'identifiable trifle' will do." *National Wildlife Federation v. Hodel*, 839 F.2d 694, 704 (D.C.Cir.1988) (quoting *United States v. SCRAP*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)). Similarly, the continuing "personal stake" needed to rebut an assertion of mootness need not be large in magnitude to suffice. Thus, as the Supreme Court has stated, a case is not moot if some stake in the outcome remains, "notwithstanding the size of the dispute." *Firefighters Local 1784 v. Stotts*, 467 U.S. 561, 571, 104 S.Ct. 2576, 2584, 81 L.Ed.2d 483 (1984). All that is necessary is that the party seeking relief "have a concrete interest in the outcome." *Id.*

In light of these principles, this case should not be dismissed on the ground of mootness. Section 12(b) of TSCA provides that any company exporting a chemical

substance that is subject to a test rule under section 4 must "notify the Administrator of such exportation or intent to export and the Administrator shall furnish to the government of such country notice of the availability of the data submitted to the Administrator under such section for such substance or mixture." 15 U.S.C. § 2611(b)(1). EPA regulations require an exporter to provide a separate notice "for the first export or intended export to a particular country in a calendar year." 40 C.F.R. § 707.65(a)(2) (1987). *See also* Final Test Rule, 51 Fed.Reg. at 40,324 (summarizing these obligations). There is also indication in the record that compliance with the notification requirement requires "more than a minimal amount of work." Supplemental Affidavit of Henry J. Sauer ¶ 5.

The acknowledgedly modest nature of these obligations does not require this court constitutionally to refuse to adjudicate the case.[5] If something still remains to be done under a rule, that is usually enough to spare it from the mootness ax. *See Casey v. FTC*, 578 F.2d 793, 796 (9th Cir.1978) (challenge to agency subpoenas not moot despite submission of all documents, where documents were not verified in accordance with subpoenas); *FTC v. Gibson Prods.*, 569 F.2d 900, 903 (5th Cir. 1978); 13A Wright & Miller, *supra,* § 3533.2 at 258–59. Although the petitioners' stake in the outcome of this case is manifestly smaller than it was when the case was filed, they still have a sufficiently concrete interest in the disposition of their

petition to warrant the exercise of federal court jurisdiction.[6]

## III. STATUTORY INTERPRETATION

The Toxic Substances Control Act requires EPA to promulgate a test rule under section 4 if a chemical substance, *inter alia,* "may present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2603(a)(1)(A)(i). The parties both accept the proposition that the degree to which a particular substance presents a risk to health is a function of two factors: (a) human exposure to the substance, and (b) the toxicity of the substance. *See Ausimont U.S.A., Inc. v. EPA*, 838 F.2d 93, 96 (3d Cir.1988). They also agree that EPA must make some sort of threshold finding as to the existence of an "unreasonable risk of injury to health." The parties differ, however, as to the manner in which this finding must be made. Specifically, three issues are presented.

The first issue is whether, under section 4 of TSCA, EPA must find that the existence of an "unreasonable risk of injury to health" is more probable than not in order to issue a test rule. CMA argues that the statute requires a more-probable-than-not finding. CMA Br. 22. EPA disagrees, contending that the statute is satisfied where the existence of an "unreasonable risk of injury to health" is a substantial probability—that is, a probability that is more than merely theoretical, speculative or conjectural. EPA Br. 21.[7]

---

5. *Cf.* 13A Wright & Miller, *supra,* § 3533.1 at 215 (fact that prospective benefit of requested relief is slight may provide "avowedly discretionary grounds" for court to decline adjudication, "[o]nce the Article III threshold has been crossed.").

6. Given the sufficiency of the export notice filing requirement as a basis for justiciability, we need not decide the sufficiency of CMA's other asserted bases for a finding of non-mootness: e.g., the possibility that transmission of EPA data to foreign governments could lead those governments to regulate EHA, the possibility that EPA will find the industry testing to be substandard and will require tests to be redone, the requirement that companies entering the EHA market reimburse the existing companies

for testing costs, or the possibility that EPA will require an additional study as to oncogenicity.

7. Thus, the Agency maintains that section 4 requires, at a minimum, a more-than-theoretical probability that exposure takes place and a more-than-theoretical probability that the toxicity of the substance, in doses such as those suspected of occurring, is sufficient to present an unreasonable risk. EPA views this as the statutory minimum needed to establish both toxicity and exposure. The degree of certainty required as to each factor does not vary no matter how strong the evidence establishing the other factor is. *See* EPA Br. 21.

Despite this assertion, the Agency in practice employs a "see-saw" approach that takes into account the strength of the evidence establish-

The second issue is whether, once industry has presented evidence tending to show an absence of human exposure, EPA must rebut it by producing direct evidence of exposure. CMA claims that, when industry evidence casts doubt on the existence of exposure, the burden of production shifts back to EPA, which must produce direct evidence documenting actual instances in which exposure has taken place. CMA Br. 27, 30. EPA, on the other hand, argues that it can make the requisite finding of exposure based solely on inferences drawn from the circumstances under which a chemical substance is manufactured and used. EPA Br. 32–33.

The third issue is whether the Agency has authority to issue a test rule where any individual's exposure to a substance is an isolated, non-recurrent event. CMA argues that, even if EPA presents direct evidence of exposure, the Act precludes issuance of a test rule where exposure consists only of rare instances involving brief exposure. CMA Reply Br. 11 n. 10. EPA contends, on the other hand, that the Act does not require in all circumstances a risk of recurrent exposure. EPA Br. 28.

We will explore each of these three issues in turn. In each instance, we must examine the statute itself and its legislative history to determine whether Congress addressed the particular point in question. If this court ascertains that Congress has directly spoken to the precise question at issue, then both the court and EPA "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *accord NLRB v. United Food & Com'l Workers Union,* — U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed. 2d 429 (1987). If, however, the statute is silent or ambiguous with respect to the specific issue, the court is left to decide only whether the Agency's construction of the statute is a reasonable one. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Congressional silence is deemed an implicit delegation of power to an agency to make policy choices consistent with the statutory purpose. *Id.* at 844–45, 104 S.Ct. at 2782–83. "[The] view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that EPA might have adopted, but only that EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (interpreting the Clean Water Act).

## A. Required Finding of "Unreasonable Risk"

■ As to the first issue in this case, the standard of probability of an unreasonable risk to health, we find that Congress did not address the precise question in issue. Examining the EPA interpretation under the second prong of *Chevron,* we find it to be reasonable and consistent with the statutory scheme and legislative history. Consequently, we uphold the Agency's construction of TSCA as authorizing a test rule where EPA's basis for suspecting the existence of an "unreasonable risk of injury to health" is substantial—i.e., when there is a more-than-theoretical basis for suspecting that some amount of exposure takes place and that the substance is sufficiently toxic at that level of exposure to present an "unreasonable risk of injury to health."

### 1. Text and Structure of the Statute

Both the wording and structure of TSCA reveal that Congress did not expect that

---

ing both factors. Under this approach, where evidence of exposure is weak and evidence of toxicity is also weak, the Agency will decline to issue a test rule. Conversely, "the stronger the EPA's scientific basis for suspecting potential toxicity, the less exposure data are needed to support the potential risk finding." Mesityl Oxide Final Test Rule, 50 Fed.Reg. 51,857, 51,860 (1985); Chloromethane and Chlorinated Benzenes Proposed Test Rule, 45 Fed.Reg. 48,524, 48,528 (1980). As this "see-saw" approach operates only when the showings as to both factors are above the statutory minimum, and as we uphold EPA's definition of that statutory minimum, we need not rule on whether the "see-saw" approach is mandated by the statute.

EPA would have to document to a certainty the existence of an "unreasonable risk" before it could require testing. This is evident from the two-tier structure of the Act. In order for EPA to be empowered to *regulate* a chemical substance, the Agency must find that the substance "presents or will present an unreasonable risk of injury to health or the environment." TSCA § 6, 15 U.S.C. § 2605(a). The *testing* provision at issue here, by contrast, empowers EPA to act at a lower threshold of certainty than that required for regulation. Specifically, testing is warranted if the substance "*may* present an unreasonable risk of injury to health or the environment." TSCA § 4, 15 U.S.C. § 2603(a)(1)(A)(i) (emphasis added). Thus, the language of section 4 signals that EPA is to make a probabilistic determination of the presence of "unreasonable risk."

## 2. Legislative History

The legislative history of TSCA compels a further conclusion. It not only shows that "unreasonable risk" need not be a matter of absolute certainty; it shows the reasonableness of EPA's conclusion that "unreasonable risk" need not be established to a more-probable-than-not degree.

A House Report on the version of the bill that eventually became TSCA underscores the distinction between the section 6 standard and the section 4 standard. To issue a test rule, EPA need not find that a substance actually does cause or present an "unreasonable risk."

> Such a finding requirement would defeat the purpose of the section, for if the Administrator is able to make such a determination, regulatory action to protect against the risk, not additional testing, is called for.

**8.** The proposed statutory language discussed in the House report differs from the "may present" language embodied in section 4 of TSCA in its enacted form. 15 U.S.C. § 2603(a)(1)(A)(i). The House version proposed the phrase "may cause or significantly contribute to" instead. H.R.Rep. No. 1341, *supra*, at 18. The adoption of the "may present" language by the Conference Committee if anything loosened the standard of causation embodied in section 4. *See*

H.R.Rep. No. 1341, 94th Cong., 2d Sess. 17–18 (1976).[8]

The House Report also contains signals indicating that Congress expected EPA to act even when evidence of "unreasonable risk" was less than conclusive. According to that report, the word "may" in section 4 was intended to focus the Agency's attention on chemical substances *"about which there is a basis for concern, but about which there is inadequate information to reasonably predict or determine the effects of the substance or mixture on health or the environment."* *Id.* at 17 (emphasis added). The Conference Committee Report reemphasized that the statutory language focused the Agency's attention on substances "about which there is a basis for concern." H.R.Conf.Rep. No. 1679, 94th Cong., 2d Sess. 61 (1976), U.S. Code Cong. & Admin.News 1976, p. 4546.

These indications of congressional intent illustrate that EPA's reading of TSCA is a permissible one. Congress intended to authorize testing where the existence of an "unreasonable risk" could not yet be "reasonably predicted." The Agency's determination that it is empowered to act where the existence of an "unreasonable risk" cannot yet be said to be more probable than not is entirely consistent with that expression of intent. The EPA interpretation is likewise consistent with the level of certainty suggested by the phrase "basis for concern." To accept CMA's position would require the Agency to gather "adequate" information to make a reasonable prediction or determination of risk before issuing a test rule. To say the least, this is not mandated by the statutory history, which indicates Congress' desire that EPA act on the basis of rational concern even in the absence of "adequate" information that an unreasonable risk existed.[9] Section 4

H.R.Conf.Rep. No. 1679, 94th Cong., 2d Sess. 60–61 (1976) U.S.Code Cong. & Admin.News 1976, p. 4491 (version reported out of conference was "similar to the House version with respect to the findings which the Administrator must make," except as to causation). The change, therefore, is not material to the instant case.

**9.** We hold only that EPA's construction of the statute is a permissible one. Thus, we necessar-

may permissibly be read to authorize issuance of a test rule on the basis of less than more-probable-than-not evidence about a potentially unreasonable risk to health.

This conclusion is further bolstered by the legislative history underlying section 6. If CMA were correct that EPA must make a more-probable-than-not finding of risk under section 4's "may present" language, then it would logically follow that section 6—which contains the term "presents or will present an unreasonable risk"—must require an even stronger than more-probable-than-not demonstration of "unreasonable risk."[10] Yet neither section 6 nor its legislative history indicate any such super-requirement of certainty. Indeed, section 6 states expressly that the Agency need only find a "reasonable basis" to conclude that an "unreasonable risk" exists. 15 U.S.C. § 2605(a). A "reasonable basis" requirement is certainly no more demanding than a more-probable-than-not requirement; indeed the phrase suggests a less demanding standard. This interpretation is confirmed by the House Report, which states that an EPA finding of "unreasonable risk" under section 6 is not expected to be supported by the same quantum of evidence as is customary in administrative proceedings.

> A finding by the Administrator that there is such a reasonable basis must include adequate reasons and explanations for the Administrator's conclusion. It does not, however, require the factual certainty of a "finding of fact" of the sort associated with adjudication.

*Id.* at 32. In sum, the standard Congress set for section 6 regulation, that the chemical "will present an unreasonable risk," is no more rigorous (and arguably is less rigorous) than a more-probable-than-not find-

ing. It follows as a matter of course that section 4's "may present" language demands even less.

Of course, it is also evident from the legislative history that Congress did not intend to authorize EPA to issue test rules on the basis of mere hunches. The House Report states:

> [T]he term "may" ... does not permit the Administrator to make a finding respecting probability of a risk on the basis of mere conjecture or speculation, i.e., it may or may not cause a risk.

H.R.Rep. No. 1341, *supra,* at 18.[11] Congress obviously intended section 4 to empower EPA to issue a test rule only after it had found a solid "basis for concern" by accumulating enough information to demonstrate a more-than-theoretical basis for suspecting that an "unreasonable risk" was involved in the use of the chemical.

CMA, curiously, insists that this very passage in the legislative history indicates that Congress embraced a more-probable-than-not standard for section 4. CMA Br. 21–22; CMA Reply Br. 5–6. CMA arrives at this conclusion by underlining the words "probability of a risk" in the quoted sentence and reading the phrase as being synonymous with "a risk that is more probable than not." This reading, however, wrenches the targeted phrase out of its immediate context and puts the legislative history as a whole on the rack. Standing alone, the term "probability of a risk" might conceivably be read to describe a risk that is at least 51 percent certain. Within its host sentence, however, the phrase "probability of a risk" clearly refers to any degree of probability except for the one set out in the phrase immediately following it. Thus, the sentence says only that the Agency must

---

ily find that CMA's reading is not the *only* permissible construction of the statute. Whether CMA's construction is *a* permissible one is a question we need not, and do not, decide.

**10.** This conclusion is dictated by the difference in meaning between "may present" and "presents or will present." It is clear from the legislative history that Congress self-consciously established a lower threshold for demonstrating "unreasonable risk" under section 4 than under section 6. *See* H.R.Rep. No. 1341, *supra,* at

14–15 ("the requirements for a determination of unreasonable risk for purposes of section 4 ... are less demanding [than for section 6]," because of the lesser regulatory effect of a section 4 test rule).

**11.** It is true, as EPA points out, that the quoted sentence refers to a House formulation of section 4 that was later modified in conference. The difference between the House version and the final version, however, is not material to the issue under decision here. *See supra* note 8.

make "a finding respecting probability of a risk," and that finding must be based on more than conjecture and speculation. The distance between the conjectural-speculative degree of probability foreclosed by Congress and the more-probable-than-not standard that CMA advances was clearly meant to be bridged by EPA's discretion and expertise. The Agency's reading of TSCA is a reasonable accommodation of the conflicting policies Congress committed to its care—specifically, the need to gather information about suspect chemicals without mandating expensive tests based on little more than a hunch. In sum, the legislative history fails to undermine EPA's choice of a standard for section 4.

### 3. Interpretations in Other Circuits

We note that EPA's interpretation of section 4 is consistent with the views of the only other two courts of appeals that have examined its "may present" language. *See Ausimont U.S.A., Inc. v. EPA*, 838 F.2d 93 (3d Cir.1988); *Shell Chemical Co. v. EPA*, 826 F.2d 295 (5th Cir.1987).

In *Ausimont,* the Third Circuit held that EPA could not require testing "based on little more than scientific curiosity." 838 F.2d at 97. A test rule could not be sustained, the court stated, if the existence of exposure were "merely a remote possibility founded on theoretical factual situations." *Id.* The Agency, it said, can validly require testing only "when an existing possibility of harm raises reasonable and legitimate cause for concern." *Id.* The court, however, recognized that the Agency's burden in the review of a section 4 test rule differs substantially from the normal standards of review applied to agency factfinding. *See*

*id.* at 96 (Agency's burden is "to demonstrate not fact, but doubt and uncertainty" as to the existence of an "unreasonable risk"). Thus, we find nothing in the Third Circuit's interpretation of section 4 that is inconsistent with EPA's reading of the statute.

The only other circuit which has considered section 4 remanded the case without reaching any decision as to its correct interpretation. In *Shell Chemical Co. v. EPA*, 826 F.2d 295, 298 (5th Cir.1987), the record showed that production of the chemical in question took place "in an enclosed, controlled environment where potential exposure ... [was] very limited." *Id.* at 297–98. During oral argument, an EPA lawyer asserted that some additional evidence of exposure had come to light after promulgation of the rule. *Id.* at 298. The Fifth Circuit remanded the case to the Agency to explore the additional evidence, observing that, without it, the case was a "close one." *Id.* The *Shell* court did not decide how strong the evidence of "unreasonable risk" must be to merit a test rule. Despite industry efforts to cite it to advantage, *see* CMA Reply Br. 10 & n. 9, *Shell* offers little guidance in our case. *See Ausimont*, 838 F.2d at 97 ("The holding in *Shell Chemical* ... is inconclusive and of no real assistance in the dispute before us.").

CMA cites other cases interpreting language identical or similar to the "may present" term of section 4 as requiring a more-probable-than-not finding of risk. These opinions are of scant assistance, however, because in the main they involve provisions authorizing the regulation or prohibition of substances, rather than mere testing.[12] Such interpretations can hardly

12. *See Corn Products Refining Co. v. FTC,* 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945) (statute prohibiting price discrimination that "may" have anti-competitive consequences; statute held to require showing of "probabl[e]" anti-competitive effect); *United States v. Lexington Mill & Elevator Co.,* 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914) (statute prohibiting the addition of substances to food that "may" render the contents injurious to health; statute held to require showing of harm under actual conditions of use).

   *See also Industrial Union Dept., AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 614–

15, 639–43, 100 S.Ct. 2844, 2850, 2862–64, 65 L.Ed.2d 1010 (1980) (plurality opinion) (regulation limiting permissible exposure to benzene; underlying statute held to require showing of "significant" risk); *Natural Resources Defense Council v. EPA,* 824 F.2d 1146, 1152 (D.C.Cir. 1987) (proposed emission standard prohibiting pollutant emissions; statute held not to require Agency to set a zero limit on emissions for which no safe exposure threshold has been discovered); *Gulf South Insulation v. CPSC,* 701 F.2d 1137, 1148 (5th Cir.1983) (rule banning a particular type of insulation; statute held to

be transplanted into the statutory scheme of TSCA, where Congress has self-consciously created a lower threshold for testing rules than for rules regulating chemical substances. *See Ausimont*, 838 F.2d at 96 (distinguishing between evidence required for test rule and evidence required for regulation under TSCA); H.R.Rep. No. 1341, *supra*, at 14 (same).

### 4. Conclusion

We have determined that Congress did not address the precise nature of the finding of "unreasonable risk of injury to health" that must underlie a section 4 test rule. EPA's interpretation of the statutory standard is consistent with the statutory scheme and its legislative history, and it is a reasonable accommodation of the conflicting policies that Congress entrusted to the Agency's care. We therefore uphold the Agency's interpretation, under which EPA is empowered to issue a test rule where, in light of the evidence before it, the existence of an "unreasonable risk of injury to health" is a substantial (i.e., more than theoretical) probability. Since "unreasonable risk of injury to health" is a function of toxicity and exposure, this standard can be restated as follows: A test rule is warranted when there is a more-than-theoretical basis for suspecting that some amount of exposure occurs and that the substance is sufficiently toxic at that exposure level to present an "unreasonable risk

of injury to health." Under the second prong of *Chevron*, we uphold the Agency's interpretation of section 4's standard for issuing a testing rule.

### B. Use of Inferences Versus Direct Evidence of Exposure

The second issue in the case is whether EPA must produce direct evidence documenting human exposure in order to rebut industry-submitted evidence casting doubt on the existence of exposure.[13] EPA contends that it need not provide direct evidence of exposure, even in response to industry evidence rebutting its initial circumstantial case on exposure, so long as the evidence on exposure as a whole provides a more-than-theoretical basis for discerning the presence of an "unreasonable risk of injury to health." EPA concedes that exposure is a necessary component of "unreasonable risk of injury to health." EPA Br. 18–19. The Agency argues, however, that it can issue a test rule where the existence of exposure is inferred from the circumstances under which the substance is manufactured and used. So long as industry evidence attacking those inferences fails to negate the Agency's more-than-theoretical basis for inferring the existence of exposure, EPA claims, a test rule is warranted. After a careful search of the legislative materials, we conclude that Congress

require agency "to quantify the risk at the exposure levels actually associated with" the product); *Monsanto Co. v. Kennedy*, 613 F.2d 947, 955 (D.C.Cir.1979) (rule prohibiting manufacture of beverage containers by use of a particular chemical; statute held to require a showing that the substance "migrates into food in more than insignificant amounts"); *ASG Indus., Inc. v. Consumer Products Safety Comm'n*, 593 F.2d 1323, 1334 (D.C.Cir.) (rule regulating design and performance characteristics of glass; statute held to require agency to support its projection of future technological advances as "meaningful and reasonable, as contrasted with mere speculative desire"), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979); *D.D. Bean & Sons Co. v. Consumer Products Safety Comm'n*, 574 F.2d 643, 651 (1st Cir.1978) (rule setting safety standards for paper matchbooks; statute held to require showing of "a real, and not a speculative, risk"); *Aqua Slide 'n' Dive v. Consumer Products Safety Comm'n*, 569 F.2d 831,

842–43 (5th Cir.1978) (rule requiring warnings and ladder chains to be affixed to swimming pool sides; statute held to require balancing of advantages with disadvantages of rule, especially in light of remoteness of risk and weak evidence that rule would reduce risk).

13. Direct evidence is evidence of the precise fact in issue. In the present context, direct evidence might consist of witness recollections of instances in which EHA exposure took place, or it might consist of instrument measurements taken on-site. Circumstantial, or indirect, evidence establishes the fact in issue by proving another fact, which affords a basis for inferring the fact in issue. In the present context, a number of general facts concerning the circumstances of EHA manufacture and use are offered as providing an inference that exposure takes place. *See* 1 S. Gard, *Jones on Evidence* § 1:3 (6th ed. 1972 & Supp.1988).

did not address this particular issue.[14]  Applying the second prong of *Chevron,* however, we conclude that the Agency's construction of section 4 is a reasonable one and therefore uphold it.

### Reasonableness of Agency Interpretation

CMA does not contest the proposition that the use of inferences to establish exposure is reasonable as a general matter. CMA Reply Br. 10–11. CMA challenges only the Agency's reliance on inferences in the face of industry evidence attacking its initial exposure finding.  *Id.*  In light of our preceding decision on the quantum of proof necessary for a test rule, however, we see no reason to require EPA to come up with additional evidence of exposure when the industry challenges its initial finding unless the industry evidence effectively reduces the basis for an exposure finding to the realm of theory, speculation and conjecture.  We conclude that it is reasonable for EPA to rely on inferences in issuing a section 4 test rule, so long as all the evidence—including the industry evidence—indicates a more-than-theoretical probability of exposure.  Whether the Agency's ultimate finding of exposure is supported by sufficient evidence depends on a *weighing* of all the evidence, not on whether the *type* of evidence produced by EPA is direct as opposed to circumstantial.

Even if EPA were required under CMA's scenario to establish exposure as more probable than not, there would be no reason to limit its proof to direct evidence. Yet CMA bases its argument for a direct evidence requirement on its claim that exposure must be shown to be more-probable-than-not.  We fail to see the purported link between these two issues.  A party may show a fact to be more probable than not solely by presenting circumstantial (i.e., inference-based) evidence.  Conversely, a party may fail to meet a more-probable-than-not burden even with the help of direct evidence.  *See* 4 S. Gard, *supra* note 13, § 29:6 (circumstantial evidence is often more reliable than direct evidence because the latter is more easily manufactured and its falsity difficult to detect).  Thus, even had we accepted CMA's contention on the more-probable-than-not issue, it would not necessarily follow that industry evidence of lack of exposure must be rebutted by EPA direct evidence that exposure exists.  At any rate, we have concluded that a standard less rigorous than a more-probable-than-not standard is reasonable and consistent with the intent of Congress.  Accordingly, we find EPA's interpretation of section 4 as not requiring direct evidence of exposure to be reasonable and consistent with the statutory scheme.[15]

### C.  Recurrent Versus Rare Exposure

■  The third statutory issue is whether section 4 of TSCA authorizes EPA to issue a test rule where any individual's exposure to a chemical is likely to be a rare, brief event.  CMA contends that only recurrent exposure warrants a test rule.  EPA maintains that it can issue a test rule in the absence of recurrent exposure, where there is a more-than-theoretical basis for suspecting that infrequent or single-dose exposure presents an "unreasonable risk of injury to health."  We find no indication in the statute or its history that Congress addressed this particular issue, but once again turning to the second prong of *Chevron,* we

---

**14.**  CMA refers us to passages in committee reports underscoring the acknowledged point that exposure is a component of "unreasonable risk of injury to health."  *See* H.R.Rep. No. 1341, *supra,* at 33; H.R.Conf.Rep. No. 1679, *supra,* at 75, U.S.Code Cong. & Admin.News 1976, p. 4560.  These contain no indication, however, that Congress ever considered whether exposure would have to be established by direct evidence rather than by inference.

**15.**  The Third Circuit's interpretation of TSCA is not to the contrary.  In *Ausimont U.S.A., Inc. v.*

*EPA,* 838 F.2d 93 (3d Cir.1988), the court upheld a test rule against industry claims that EPA had not made an adequate finding of human exposure.  Evidence of exposure was drawn from an industry survey and from the fact that not all potentially exposed workers wore respirators routinely.  *Id.* at 96–97.  The court concluded that the exposure finding was supported by substantial evidence, without mentioning that the finding was based, at least in part, on circumstantial evidence.

deem reasonable the Agency's construction of section 4 as permitting a test rule even where exposure is not recurrent.

### 1. Reasonableness of Agency Interpretation

Requiring testing in the absence of recurrent or long-term exposure would be unreasonable only if there were not a more-than-theoretical probability that non-recurrent, brief exposure could create an "unreasonable risk of injury to health." Here the agency has already concluded that even one-time exposure to suspected developmental toxicants (of which EHA is one) may be sufficient to cause harm to a developing fetus. Guidelines for the Health Assessment of Suspect Developmental Toxicants, 51 Fed.Reg. 34,028, 34,037 (1986). Where the pool of potentially exposed persons consists of hundreds of individuals, and where the substance in question is toxic in small doses, the mere fact that exposure events might occur on an accidental, rare or occasional basis would not prevent the substance from potentially causing a significant degree of injury to human health. To interpret TSCA as not authorizing testing where potential exposure is brief or non-recurrent would render it ineffective in such circumstances. Certainly, this court should not substitute its judgment for that of the Agency on the issue of whether occasional exposure to a developmental toxicant can ever merit a test rule. We therefore hold the EPA construction of section 4 on this point to be reasonable and consistent with the purpose of TSCA.[16]

### 2. Interpretations in Other Circuits

We are not dissuaded from this conclusion by the cases in two other circuits CMA cites to bolster its claim that recurrent exposure is necessary to justify testing under section 4 of TSCA. *See Ausimont U.S.A., Inc. v. EPA*, 838 F.2d 93 (3d Cir. 1988); *Shell Chemical Co. v. EPA*, 826 F.2d 295 (5th Cir.1987). It is true that both *Ausimont* and *Shell* mention amount of exposure as a relevant factor in a determination of "unreasonable risk" *Ausimont*, 838 F.2d at 96; *Shell*, 826 F.2d at 298. Neither of the opinions, however, asserts that a particular quantity of exposure is needed in all instances to warrant a test rule. Nor do they assert that individuals must be exposed repeatedly. The cases lay down no statutory interpretation inconsistent with the one EPA has adopted. Assuredly, amount or quantity of exposure is relevant in determining whether there is a more-than-theoretical basis for suspecting that the combination of toxicity and exposure is sufficient to present an "unreasonable risk of injury to health." Clearly, the necessary amount of exposure to meet that norm will vary depending on the level of exposure at which the substance's toxicity is likely to present an "unreasonable risk of injury to health." None of this is to say, however, that EPA can never issue a test rule unless recurrent exposure takes place.

### D. *Summary of Statutory Interpretation*

We reject all three of CMA's challenges to EPA's statutory construction of section 4. Summarizing the foregoing discussion, we uphold EPA's conclusion that it is em-

---

**16.** Counsel for CMA stated at oral argument that the testing protocols the Agency issued for EHA were designed to test the effects of prolonged and repeated exposure, while, by contrast, actual workplace exposure (if any) was isolated and rare. This was the first time, however, that CMA raised any objection to the testing protocols themselves. CMA's argument had been, rather, that isolated and rare exposure to a chemical substance does not warrant any test rule at all. *See* CMA Reply Br. 11 n. 10. At any rate, it is unclear that the testing protocols were in fact focused solely on prolonged or repeated exposure. *See* Final Test Rule, 51 Fed.Reg. at 40,322 (test data to be collected "on both re-

peated dose exposure and single dose exposure").

Moreover, even assuming CMA's characterization of the testing protocols to be correct, this particular contention lies in an area in which the need for judicial deference to agency expertise is especially clear. As judges, we should be loath to declare that tests involving repeated exposure of laboratory animals to a substance have no value in determining the effects on humans of rare or occasional exposure to the same substance. We decline to hold on this record that the Agency's testing protocols were flawed.

powered to issue a test rule where the evidence pointing to the presence of an "unreasonable risk of injury to health" is substantial enough to indicate that the decision to issue a test rule is based on more than theory, speculation and conjecture. The Agency must find that there is a more-than-theoretical basis for concluding that some amount of exposure takes place and that toxicity at that level of exposure suffices to present an "unreasonable risk of injury to health." Inferences drawn from the circumstances under which a substance is manufactured and used can suffice to establish the existence and amount of exposure. Industry-supplied evidence attacking those inferences must be rebutted by EPA only if the industry evidence renders the probability of exposure at a level sufficient to present an unreasonable risk no more than theoretical and speculative. So long as there is a more-than-theoretical probability that the toxic substance in rare or single doses presents an "unreasonable risk of injury to health," the statutory standard is met whatever the infrequency of exposure.

We turn now to consider the sufficiency of the evidence in this record to meet these statutory standards.

### IV. STANDARD OF REVIEW FOR AGENCY FINDINGS

■ The Final Test Rule was promulgated under section 4 of TSCA, 15 U.S.C. § 2603(a). Judicial review of the rule must proceed according to 15 U.S.C. § 2618(c)(1)(B)(i), which specifically states that the Administrative Procedure Act ("APA") standard customarily applied in agency cases, 5 U.S.C. § 706, is inapposite:

> [I]n the case of review of a rule under section 2603(a) ... of this title, the stan-

dard for review prescribed by paragraph (2)(E) of such section 706 [of title 5] shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record ... taken as a whole....

15 U.S.C. § 2618(c)(1)(B)(i).

This case, therefore, does not turn on an interpretation of the term "substantial evidence" as it appears in the APA, 5 U.S.C. § 706(2)(E), but on an interpretation of the term "substantial evidence in the rulemaking record ... taken as a whole" as it appears in TSCA, 15 U.S.C. § 2618(c)(1)(B)(i). Despite the similarity in wording, Congress apparently contemplated that the TSCA standard should be viewed as a distinct standard; otherwise there would have been no need to specifically rule out the APA review standard.

The legislative history of TSCA further indicates that Congress perceived some difference between the standard it chose for TSCA and the APA's arbitrary-and-capricious standard.[17] The House Report explained:

> [I]t is the intent that the traditional presumption of validity of an agency rule would remain in effect, [but] ... [t]he Committee has chosen to adopt the "substantial evidence test," for the Committee intends that the reviewing court engage in a *searching review* of the Administrator's reasons and explanations for the Administrator's conclusions.

H.R.Rep. No. 1341, *supra*, at 55–56 (emphasis added).[18]

The Conference Committee Report further illuminated its rejection of the arbitrary-and-capricious standard:

---

**17.** *Cf. Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 520 (D.C.Cir.1983) (Congress, rejecting a substantial evidence standard for the Clean Air Act in 1977, was nonetheless aware that there may be "little practical difference" between substantial-evidence review and arbitrary-and-capricious review) (quoting H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 178 (1977)). *See also Association of Data Processing Serv. Org. v. Board of Governors of the Fed. Res. Sys.*, 745 F.2d 677, 683–84 (D.C.Cir.1984) (suggesting that, in the context of the APA, there is

"no *substantive* difference" between the two standards) (emphasis in original).

**18.** That report explained a House amendment to an earlier Senate bill proposing a different standard of review. *See* S.Rep. No. 698, 94th Cong., 2d Sess. 65 (1976). In the Conference Committee, the House won out. *Compare* S.Rep. No. 698, *supra*, at 28, 65, *with* H.R.Rep. No. 1341, *supra*, at 55–56, 126, *and* H.R.Conf.Rep. No. 1679, *supra*, at 42, 96.

[T]he conferees have adopted the "substantial evidence" test because they intend that the reviewing court focus on the rulemaking record to see if the Administrator's action is supported by that record. Of course, the conferees do not intend that the court substitute its judgment for that of the Administrator.

H.R.Conf.Rep. No. 1679, *supra*, at 96, U.S. Code Cong. & Admin.News 1976, p. 4581. Both the House and the Conference Report thus indicate that it was Congress' intent that review of test rules under section 4 of TSCA be more searching than the judicial review undertaken in most agency cases. Interpreting courts have similarly concluded that the standard of review for test rules under TSCA is a particularly "demanding" one. *Ausimont U.S.A., Inc. v. EPA*, 838 F.2d 93, 96 (3d Cir.1988); *Shell Chemical Co. v. EPA*, 826 F.2d 295, 297 (5th Cir.1987); *accord Environmental Defense Fund v. EPA*, 636 F.2d 1267, 1277 (D.C.Cir.1980).

This fairly rigorous standard of record review should not, however, be confused with the substantive statutory standard previously discussed at length. EPA's permissible interpretation of "may present an unreasonable risk" works in tandem with the "substantial evidence" standard of record review to effectuate a statutory scheme that empowers the Agency to require testing where the existence of an "unreasonable risk of injury to health" is not yet more-probable-than-not, but at the same time the Agency is required to identify the facts that underlie its determination that there is a more-than-theoretical basis to suspect the presence of such a risk. *See Ausimont*, 838 F.2d at 96 ("[H]ere we look to see if the Administrator produced substantial evidence to demonstrate not fact, but doubt and uncertainty.").

## V. Support in the Rulemaking Record

This court must affirm the Final Test Rule unless the record taken as a whole fails to provide substantial evidence demonstrating a more-than-theoretical probability of exposure and a more-than-theoretical probability of toxicity at a suspected level of exposure that presents an "unreasonable risk of harm." We conclude that the Agency's findings are supported by substantial evidence.

### A. *Evidence of Exposure to EHA*

■ EPA ultimately concluded that there is a more-than-theoretical probability that workers are exposed to EHA. After revising its estimate of the likely amount of exposure downward in response to industry comments, the Agency estimated that workers are likely to be exposed on infrequent occasions as a result of accidental spillage and that such exposure could amount to 60 milligrams of EHA per kilogram of body weight for each incident. Final Test Rule, 51 Fed.Reg. 40,320 (exposure believed to be "incidental" rather than routine).

Before issuing the Proposed Test Rule, EPA adduced a number of facts from which it could reasonably have inferred potential exposure. Although industry representatives presented rebuttal evidence purporting to show widespread use of gloves and purporting to show the effectiveness of gloves in preventing dermal exposure, EPA rationally concluded in the Final Test Rule that this evidence did not overcome its finding of potential exposure. First, weaknesses in testing methods suggested that the purported facts averred by industry had not been established reliably. Second, and more importantly, the very facts averred by industry (even assuming their truth) tended to support rather than refute a finding of potential exposure.

A number of facts supported EPA's initial inference of potential exposure. First, the number of employees involved in handling EHA is not small: approximately 400 are potentially exposed. Proposed Test Rule, 50 Fed.Reg. at 20,680; Final Test Rule, 51 Fed.Reg. at 40,319–20. Second, a large amount of EHA is produced and used: some 20 to 25 million pounds annually. Proposed Test Rule, 50 Fed.Reg. at 20,679; Final Test Rule, 51 Fed.Reg. at 40,319. Increases in production are expected to raise this amount substantially. *Id.*

at 40,322; S.J.A. 516. *Cf. Shell Chemical Co. v. EPA*, 826 F.2d 295, 298 (5th Cir.1987) (in review of a TSCA section 4 test rule, remand to EPA is appropriate where EPA asserts post-promulgation increases in use not anticipated at time of rulemaking). Third, EHA is handled not at one or a small number of plants with uniform practices: rather, it is handled at two manufacturing plants and approximately 100 processing plants nationwide, giving rise to legitimate doubts by EPA about the uniformity of safety practices. Proposed Test Rule, 50 Fed.Reg. at 20,680; Final Test Rule, 51 Fed.Reg. at 40,319. Fourth, certain actions (e.g., drumming and undrumming, cleaning, sampling) were deemed likely by EPA to subject workers to dermal exposure. Proposed Test Rule, 50 Fed.Reg. at 20,680; Final Test Rule, 51 Fed.Reg. at 40,319. Fifth, EPA inferred potential exposure from the fact that glove use is not required by existing federal regulations. Proposed Test Rule, 50 Fed.Reg. at 20,681. Sixth, EPA noted that "the physicochemical properties of EHA do not force workers to avoid contact with EHA"—it is a colorless liquid with a mild odor. Final Test Rule, 51 Fed.Reg. at 40,319. From these facts, EPA logically could have reached the initial conclusion that there was a more-than-theoretical probability of human exposure to EHA.

As the record must be viewed as a whole, contrary evidence—such as that purportedly contained in the industry Glove Use Survey and Glove Permeability Study—should be given careful attention. The industry studies, however, did not weaken the EPA finding of potential exposure. Indeed, the Glove Use Survey lent significant support to that finding.

First of all, EPA convincingly discredited the Glove Use Survey, to the extent that it purported to show widespread use of gloves. As EPA pointed out in the rulemaking record, the survey entailed no on-site visits or inspections to facilities producing or using EHA. Final Test Rule, 51 Fed.Reg. at 40,320. The independent researchers conducting the survey did not in any way verify the responses of company managers. *Id.* Nor did the researchers audit glove use themselves—a noteworthy weakness of the survey, in view of the 20 percent of respondent employers who indicated that they did not monitor glove use either. J.A. 39. The researchers obtained no exposure information from workers, whose incentives to detail non-use would presumably be greater than those of management. Final Test Rule, 51 Fed. Reg. at 40,320. The candor of responses was also diluted by telling survey participants that their responses would be used as the basis for comments on a proposed EPA test rule. J.A. 434.[19]

In addition to its skepticism of the Glove Use Survey, EPA discredited the Glove Permeability Study, to the extent that it purported to show the effectiveness of gloves in preventing exposure to EHA. In the study, gloves were immersed for seven hours continuously, with no resultant breakthrough of EHA. J.A. 68. EPA contends it is possible that an employee would wear a pair of EHA-doused gloves for longer than seven hours. Final Test Rule, 51 Fed.Reg. at 40,320. Indeed, the testing standards do not indicate a seven-hour time limit, but indicate rather that immersion should continue until breakthrough occurs. J.A. 448. Additionally, continuous immersion testing does not address the possibility of intermittent exposure over a period of time, especially with reused gloves. J.A. 320–21. Thirdly, the immersion test evaluated only two types of gloves, while workers in fact use five different types of gloves. *Compare* J.A. 68 (nitrile and neoprene gloves tested) *with* J.A. 36 (neoprene, rubber, polyvinyl chloride, latex and leatherpalmed cotton gloves used). Final Test Rule, 51 Fed.Reg. at 40,320. Finally,

---

**19.** Contrary to CMA's protests, EPA did not engage in "gamesmanship" in promulgating the test rule. CMA Br. 37. After one EPA representative registered several objections to the survey methodology on July 8, 1985, another EPA representative wrote to CMA on July 17, 1985, denying a request for a deadline extension for written comments. The fact that the letter told CMA to go ahead and conduct "the survey" and present the results orally at a September hearing hardly constitutes endorsement of methodology specifically objected to nine days earlier.

the study tested only the permeation of pure EHA, while EHA is often presented in mixtures with mineral spirits during processing operations. *Id.* Permeation of some substances in mixtures has been found greater than in pure form. J.A. 452, 455. Thus, the Glove Permeability Study did not succeed in effectively rebutting EPA's inference of potential exposure so as to dissipate any serious concerns about the likelihood of exposure.

More importantly, however, the Glove Use Survey lent positive evidentiary support to the Agency's exposure finding. Survey respondents stated that dermal contact with EHA is possible in several situations, including the emptying and filling of drums, sampling, and maintenance. J.A. 36. They indicated the use of five different types of gloves, J.A. 36, only one of which was included in the Glove Permeability Study. J.A. 68. (Leather-palmed cotton gloves, J.A. 36, could be expected to differ substantially from the neoprene and nitrile gloves used in the test.) Survey respondents indicated the use of half a dozen different procedures for ensuring the use of gloves. J.A. 37. Because no measurements were made of actual glove use, there is no basis for determining the extent to which any of these methods succeeded. Since only 15 percent of respondents used all the listed methods, J.A. 37, there exists a real possibility that some companies do not use the most effective method or combination of methods for ensuring glove use. Five percent of the respondents reported that gloves are not routinely worn during equipment maintenance, J.A. 38, and 20

percent indicated they do not monitor glove use, J.A. 39. Eight percent of the respondents do not even instruct their employees to wear gloves. J.A. 36. Most importantly, fully 25 percent of the respondents reported "that *there are 'occasional' situations in which dermal contact occurs.*" J.A. 39 (emphasis added). Company managers specifically mentioned "small spills," "accidental leaks" and "minor splashes" that occur "when employees do not wear protective gloves provided." J.A. 39.[20] Cumulatively, these data are sufficient to support the conclusion that there is a more-than-theoretical probability of human exposure to EHA. Where one fourth of the companies making or using EHA report occasional dermal contact, the likelihood of exposure cannot be characterized as speculative or theoretical. *Cf. Ausimont U.S.A., Inc. v. EPA*, 838 F.2d 93, 97 (3d Cir.1988) (evidence of exposure sufficient where not all workers exposed to fugitive gases wear respirators routinely). In sum, EPA has pointed to sufficient evidence of dermal exposure to warrant the promulgation of a test rule.

### B. *Evidence of the Toxicity of EHA*

█ The Agency bears the burden of demonstrating that there is a more-than-theoretical basis for determining that EHA is toxic enough at the level of exposure suspected to present an "unreasonable risk of injury to health." Two purported health hazards underlay the rule challenged in this case: developmental toxicity and subchronic toxicity.[21] EPA predicts the occur-

---

**20.** Counsel for CMA suggested at oral argument that the respondents might have misunderstood the questions and indicated hypothetical, rather than actual, instances of exposure. It is difficult to imagine how respondents could have misunderstood questions worded as follows: "To your knowledge, are there situations where these gloves are not worn by your workers and dermal contact with 2–EH Acid occurs?" and (if an affirmative answer is given) "In what situations does dermal contact with 2–EH Acid occur?" J.A. 45–46. The responses to the latter question suggest by their specificity that the respondents understood that the question did not seek hypothetical answers. *See* J.A. 39–40 (indicating that spills occurred "usually in sampling procedures," or "while pouring material

from small one gallon container to a 70 gallon vessel").

**21.** EPA also voiced concerns about the possible oncogenicity of EHA. Proposed Test Rule, 50 Fed.Reg. at 20,682. Based on an understanding that the National Toxicology Program ("NTP") would perform oncogenicity studies on a chemical similar to EHA, the Agency did not require such studies in the rule now under review. Later, after NTP ceased plans to conduct such tests, EPA promulgated a test rule under TSCA section 4 requiring oncogenicity testing on that chemical. 2-Ethylhexanol Final Test Rule, 52 Fed.Reg. 28,698 (1987). EPA's concerns about the possible oncogenicity of EHA are not under review in the present case.

rence of exposure episodes involving up to 60 milligrams of EHA per kilogram of body weight for each incident. After a thorough review of the record, we uphold the Agency's determination that a more-than-theoretical basis exists for suspecting toxicity at that level of exposure.

### 1. Evidence of Developmental Toxicity

EPA based its finding as to developmental toxicity on several factors, none of which has been rebutted successfully by CMA. First, one study (the "Ritter Study") reported that EHA caused an increased incidence of fetal malformations. J.A. 233–36. Another (the "Hazelton Laboratories Study") illustrated adverse effects on fetuses of laboratory animals. Proposed Test Rule, 50 Fed.Reg. at 20,682. It is true that EPA described the Ritter Study as not being state-of-the-art and thus "inappropriate for assessing human risk." Final Test Rule, 51 Fed.Reg. at 40,320. The Agency noted flaws with the Hazelton Laboratories Study. *Id.* at 40,321. EPA noted at the same time, however, that the studies, flawed as they concededly were, "raise[d] sufficient concern" about developmental toxicity to warrant testing. *Id.* at 40,320. In a statutory structure that calls for a testing rule precisely where there are "insufficient data and experience" on which to base a conclusion as to toxicity, 15 U.S.C. § 2603(a)(1)(A)(ii), the existence of such studies surely provides the basis for demanding testing in order to *assess* risk conclusively. *Cf. Ausimont*, 838 F.2d at 97 ("[i]f no doubt existed, testing would not be required").

Secondly, the agency found that EHA is structurally similar to valproic acid, which has been shown to cause harm to the developing embryo. Proposed Test Rule, 50 Fed.Reg. at 20,681–82. CMA describes the EPA inference of toxicity drawn from these facts as "speculative and debatable." CMA Br. 48. But Congress explicitly contemplated that EPA would base test rules on comparisons among structurally similar chemicals. *See* H.R.Rep. No. 1341, *supra*,

at 17. It is true that CMA criticized the studies done on valproic acid. J.A. 105–08. But EPA responded with its own analysis of those points. J.A. 307–11. Again, while it recognized that existing studies were inconclusive, EPA maintained that they were sufficient to raise enough concern to merit conducting new studies that would be more adequate. J.A. 308. *Cf. Ausimont*, 838 F.2d at 96 (characterizing similar arguments by industry as "highlight[ing] the need for testing").

The statutory standard requires EPA to correlate the suspected toxicity of a substance with the suspected level of exposure. We find that the Agency had a more-than-theoretical basis for suspecting that the toxicity of EHA, even in rare or single doses of 60 milligrams per kilogram of body weight, sufficed to present an "unreasonable risk of injury to health."

Sufficient evidence existed as to single-dose toxicity. The Ritter Study found evidence of developmental toxicity in test animals after single doses of EHA. Final Test Rule, 51 Fed.Reg. at 40,320. Another study (the "Nau Study") showed that chemicals structurally similar to EHA cause fetal effects in test animals in single doses. *Id.* at 40,321; J.A. 291, 292. Single-dose toxicity is considered by EPA to be a possibility with developmental toxicants generally. Guidelines for the Health Assessment of Suspect Developmental Toxicants, 51 Fed.Reg. 34,028, 34,037 (1986).

The evidence, moreover, provided sufficient grounds for concern as to single doses in the suspected amount of real-world exposure, 60 milligrams of EHA per kilogram of body weight. The Ritter and Nau Studies involved exposing test animals to substance amounts 10 to 30 times those expected to occur to EHA workers.[22] These large-dose exposures caused high incidence of fetal toxicity; in one study, a non-exposed control group experienced 4.4 percent incidence of fetal toxicity while exposed animals experienced 71.1 percent in-

---

**22.** *Compare* Final Test Rule, 51 Fed.Reg. at 40,-320 (worker exposure estimated at 60 mg/kg per contact) *with id.* at 40,320–21 (studies in-

volved exposure of animals to EHA doses ranging from 600 mg/kg per contact up to 1.8 g/kg per contact).

cidence of fetal toxicity. Final Test Rule, 51 Fed.Reg. at 40,320. While conceding that large-dose testing does not necessarily provide precise information for predicting toxicity at small dosage levels, EPA pointed out that a "no-observed-effect level" for EHA has never been found. *Id.* at 40,321. EPA reasonably maintained, therefore, that the high-dosage studies provided a rational basis for requiring tests to study the effects of EHA at lower dosages. Indeed, as our examination of the legislative history made clear, section 4 of TSCA authorizes issuance of test rules in the absence of "adequate information to reasonably predict" health effects. Were we to deem the high-dosage studies an insufficient basis for a test rule, EPA would be unable to react to the potential dangers of a chemical substance until either the Agency conducted government-funded studies at the expected real-world dosage level or private researchers fortuitously happened to publish such studies. The aim of TSCA was to make producers and users of chemical substances assume the costs of testing, so long as a more-than-theoretical basis existed for finding the presence of an "unreasonable risk of injury to health." We are persuaded that EPA's finding of potential developmental toxicity is supported by substantial evidence.

### 2. Evidence of Subchronic Toxicity

EPA bases its finding on subchronic toxicity on two studies ("Moody I" and "Moody II"). Moody I reported that EHA and similar substances adversely affect the livers of test animals. J.A. 401–08. Moody II reported that EHA and similar chemicals cause increases in liver size, increases in liver enzyme alterations, and decreases in blood serum fat levels. Final Test Rule, 51 Fed.Reg. at 40,321. EPA credibly rejected CMA's contention that these reactions constituted "simple adaptation" in the organism. *Id.* The Agency based its conclusion on the magnitude of the changes and the short (three-week) duration of the study. *Id.* Further support for a finding of potential subchronic toxicity lies in the fact that valproic acid (as noted above, a substance structurally analogous to EHA) is toxic to

the liver of both animals and humans. *Id.* Thus, EPA marshaled substantial evidence of subchronic toxicity, which was not appreciably weakened by CMA's attempts at rebuttal.

### CONCLUSION

We find this petition for review presents a justiciable, non-moot case. We uphold EPA's interpretation of section 4 of TSCA as authorizing issuance of a test rule where there is a more-than-theoretical basis to suspect the presence of "unreasonable risk of injury to health." Exposure may be established by means of inferences, and exposure to a particular subject need not be recurrent to warrant testing. Finally, we find that EPA has presented substantial relevant evidence of exposure and toxicity so as to justify the promulgation of a test rule and has carefully and credibly answered the criticisms of industry. EPA's findings as to exposure, subchronic toxicity and developmental toxicity are supported by substantial evidence on the record viewed as a whole. The petition for review is therefore

*DENIED.*